1
2

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF PUERTO RICO

3
4

**KARLA MALAVE-TORRES,**

**Plaintiff,**

5

**v.**                                                         **CIVIL NO. 11-1432 (GAG)**

6

**JOSE M. CUSIDO, et al.,**

7

**Defendants.**

8

9

### OPINION AND ORDER

10      On May 10, 2011, Karla Malave Torres ("Plaintiff") filed suit against Jose Cusido

11  ("Cusido"), Sterling Foods, Inc. ("Sterling") and unnamed insurance companies (collectively

12  "Defendants"), alleging she was discriminated against due to her pregnancy.  (See Docket No. 1.)

13  Currently before the court is Defendants' motion for summary judgment. (Docket No. 50.) Plaintiff

14  opposed the motion (Docket No. 67).  Defendants filed a reply, which included a motion to strike

15  Plaintiff's counter-statement of uncontested facts (Docket No. 77).  Plaintiff filed a sur-reply

16  (Docket No. 81).  After reviewing the parties' submissions and applicable law, the court **GRANTS**

17  **IN PART** and **DENIES IN PART** Defendants' motion to strike (Docket No. 77) and **GRANTS**

18  Defendants' motion for summary judgment (Docket No. 50).

19  **I.      Standard of Review**

20      Summary judgment is appropriate when "the pleadings, depositions, answers to

21  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

22  genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

23  of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  See FED. R. CIV. P. 56(a). "An issue

24  is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

25  'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson

26  v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

27  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-

28  moving party's case.  Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to

Civil No. 11-1432 (GAG)

support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

**II.    Plaintiff's Self-Serving Affidavit**

Prior to establishing the relevant factual background, the court must first rule upon Defendants' motion to strike Plaintiff's self-serving affidavit.[1]  (See Docket No. 77.)  Defendants filed their motion for summary judgment on July 24, 2012, in which they referenced the deposition testimony of Plaintiff.  (See Docket No. 50-2.)  Plaintiff, in her opposition to summary judgment (Docket No. 67), relies heavily on disputed material issues of fact raised in her counter-statement of contested facts (Docket No. 68).  Many of the facts Plaintiff refers to in her opposition brief are only supported by Plaintiff's sworn affidavit, dated September 12, 2012.  (See Docket No. 69-1.)

---

[1]  Plaintiff's self-serving affidavit (the "Affidavit") is found at Docket No. 69-1.

2

Civil No. 11-1432 (GAG)

Defendants argue the affidavit, signed roughly a month and a half after Defendants submitted their statement of uncontested facts, is a sham whose sole purpose is to create material issues of fact that defeat Defendants' motion for summary judgment.  (See Docket Nos. 77 & 78.)  Plaintiff contends her Affidavit clarifies her deposition testimony and touches upon instances and activities not discussed during her deposition, but the Affidavit does not conflict with her deposition testimony. (See Docket No. 81.)

    A.    Sham Affidavit

        Some form of the sham affidavit doctrine has been accepted by each circuit court of appeals. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 251-52 (3d Cir. 2007) (citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969); Darnell v. Target Stores, 16 F.3d 174, 176 (7th Cir. 1994); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992); Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir. 1988); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); Reid v. Sears Roebuck and Co., 790 F.2d 453, 460 (6th Cir. 1986); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); Albertson v. T.J. Stevenson Co., 749 F.2d 223, 228 (5th Cir. 1984); Van T. Junkins & Assocs. v. U.S. Indus. Inc., 736 F.2d 656, 657-59 (11th Cir. 1984); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364-65 (8th Cir. 1983); Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir. 1975)).  First Circuit precedent states, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni, 44 F.3d at 4-5. The district court need not specifically enumerate each contradiction between the witness' prior testimony and the later filed affidavit in order to disregard the evidence. See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (affirming district court's decision to disregard later filed affidavit that contradicted prior deposition testimony).  Such testimony can be stricken by the court when the party proffering the evidence provides no

Civil No. 11-1432 (GAG)

1  satisfactory explanation for the changed testimony.  See Torres v. E.I. Dupont De Nemours & Co.,

2  219 F.3d 13, 20-12 (1st Cir. 2000) (citing Colantuoni, 44 F.3d at 4-5).

3        In determining whether the testimony constitutes an attempt to manufacture an issue of fact

4  so as to defeat summary judgment, the court may consider the timing of the affidavit, as well as the

5  party's explanation for the discrepancies.  See Orta-Castro, 447 F.3d at 110.  The timing of the

6  affidavit is probative of the party's intent, as an affidavit executed after the moving party moves for

7  summary judgment suggests ill motive.  See id. (citing Colantuoni, 44 F.3d at 5; Torres, 219 F.3d

8  at 20).  The First Circuit also noted that when counsel represents a party during a deposition, any

9  questions that are confusing or incorrect impressions garnered by the deponent may be raised by

10 counsel during the deposition.  When no such issues are raised during the deposition, but are later

11 relied upon by the party in order to defeat summary judgment, a court may determine the sudden

12 confusion to be an unsatisfactory explanation for the changed testimony.  See Orta-Castro, 447 F.3d

13 at 110-11; see also Ziehm v. Radioshack Corp., Civil No. 09-69-P-S, 2010 WL 2079550, at *3 (D.

14 Me. May 22, 2010).

15       This doctrine excludes conflicting testimony given by an interested party, but does not bar

16 a party from "elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel

17 on deposition."  Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009) (internal quotation marks

18 omitted) (internal citations omitted).  This doctrine does not allow a party to submit an affidavit that

19 contradicts prior deposition testimony.  See id.

20       Determining whether to apply the sham affidavit doctrine to the case at bar poses several

21 issues for the court.  Defendants request the court strikes the Affidavit entirely because the

22 statements are self-serving, unsupported by the record, and contradict Plaintiff's previous deposition

23 testimony.  (See Docket No. 77.)  To support this argument, Defendants point out ten statements

24 contained in the Affidavit that purportedly contradict Plaintiff's previous testimony.  (See id.)

25 However, of these ten statements, only one is directly contradicted by Plaintiff's deposition

26 testimony, one statement does not provide any contradictory testimony at all, and the other eight are

27

28                                              4

Civil No. 11-1432 (GAG)

1   contradicted mainly by e-mails entered into evidence.  (See id. at 4, 7-18.)  Defendants claim these

2   supplemental factual assertions contained in the Affidavit are not supported elsewhere in the record.

3   Whether such evidence should be excluded because it is contrary to other evidence in the record and

4   whether a self-serving affidavit testimony, by itself, can defeat summary judgment, are worth

5   discussing in more depth.

6                    **1.    Affidavit Testimony as a Valid Form of Evidence**

7            First, the court must determine whether Plaintiff's sworn testimony, through the Affidavit,

8   is an acceptable form of evidence.  As a general matter, evidence in the form of an affidavit is equal

9   to other forms of evidence, such as deposition testimony.  See  10A Wright & Miller, Federal

10  Practice & Procedure § 2727 (3d ed. 2011) ("facts asserted by the party opposing the [summary

11  judgment] motion, if supported by affidavits or other evidentiary materials, are regarded as true.").

12  Even a clearly self-serving affidavit constitutes evidence which the court must consider when

13  resolving summary judgment motions.  See Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir.

14  1997) ("A party's own affidavit, containing relevant information of which he has first-hand

15  knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary

16  judgment.").  The Seventh Circuit has repeatedly stated the self-serving nature of affidavits does not

17  permit the court to value the testimony any less than other type of evidence; rather, "'[m]ost

18  affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate

19  a plaintiff's evidence when deciding whether a material dispute requires trial.'" Kaba v. Stepp, 458

20  F.3d 678, 681 (7th Cir. 2006) (quoting Wilson v. McRae's, Inc., 413 F.3d 692, 694 (7th Cir. 2005)).

21  Rather than basing the validity of an affidavit upon how self-serving the statements are to the affiant,

22  courts require statements contained in affidavits to be factually specific and supported by the record.

23  See Brisbin v. Aurora Loan Servs., LLC, 679 F.3d 748, 754 (8th Cir. 2012) (holding "self-serving

24  affidavit not sufficiently specific to raise genuine issue of material fact in face of uncontradicted

25  facts in record); Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting

26  FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("'[C]onclusory,

27  self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to

28                                              5

**Civil No. 11-1432 (GAG)**

create a genuine issue of material fact.")).  The Hexcel court stated that the declarations contained within an affidavit must be made with personal knowledge; otherwise, the evidence is inadmissible. See Hexcel Corp., 681 F.3d at 1063.

The court uses these factors to determine whether the Affidavit is a sham.  The analysis does not simply end with a determination that the Affidavit is self-serving.  See Cadle Co., 116 F.3d at 961 n.5.  To this end, the court determines the Affidavit qualifies as valid evidence, which may be sufficient to defeat Defendants' summary judgment motion.  The Affidavit is made under the penalty of perjury, similar to that of a deposition.  (See Docket No. 69-1.)  Further, the Affidavit is factually specific and avoids boiler-plate generalities.  Plaintiff includes a number of names, dates, and specific instances pertaining to her job duties that were also discussed in her deposition.  This information is relevant to the summary judgment motion and Plaintiff has first-hand knowledge of the contents of the Affidavit.  Reserving judgment as to whether the remaining evidence in the record supports the statements in the Affidavit, the Affidavit sufficiently includes specific facts to constitute valid evidence.

### 2.    Contradiction Through E-mail Evidence

First Circuit precedent analyzing whether a self-serving affidavit may contradict other evidence in the record is scarce.  The precedent that does exist makes one point is clear: a party may not contradict previously given deposition testimony with a later filed affidavit.  See Colantuoni, 44 F.3d at 4-5; Orta-Castro, 447 F.3d at 110.  While this point clear, it is not clear whether this principle includes contradictions between non-deposition testimony and a later-filed affidavit.  Defendants' argue the contents of the Affidavit contradict numerous e-mails previously written by Plaintiff.  (See Docket No. 77 at 8-18.)  Defendants primarily rely upon Colantuoni and its progeny to demonstrate that such tactics have been condemned by the First Circuit.  The most critical issue of this argument is whether Plaintiff's later filed affidavit must be stricken because it contradicts Plaintiff's prior e-mails.

The theory behind Colantuoni and similar cases is that a party may not directly contradict previous sworn testimony with later filed sworn testimony.  Most commonly, this occurs when a

**Civil No. 11-1432 (GAG)**

party attempts to defeat a summary judgment motion by contradicting its own deposition testimony with a later filed affidavit. However, some circuits have been shrewd in the application of this doctrine due to the ramifications of its use. For example, in Nelson, the Ninth Circuit held deposition testimony by witnesses of an accident may be used by the plaintiff to discredit the plaintiff's own deposition testimony. See Nelson, 571 F.3d at 928 ("The rationale underlying the sham affidavit rule is that a party ought not to be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment.") (emphasis in original). The Nelson court declined to extend this rule to evidence from third parties that contradicts the party's own testimony. See id. at 929. The court held such a discrepancy was sufficient to create a material issue of fact for the jury to decide. See id.

The Fourth Circuit has taken a different approach when evaluating the effect of self-serving affidavits that are not well-supported by the record. In Altemus v. Fed. Realty Inv. Trust, No. 11-2213, 2012 WL 3090915, at *5 (4th Cir. July 31, 2012), the court upheld the district court's grant of summary judgment because the affidavit was unsupported by the record and there was opposite ample evidence to the contrary. See Altemus, 2012 WL 3090915 at *5. While allowing the affidavit to be considered, the court noted, "[i]n light of extensive evidence to the contrary, Altemus' affidavit amounts only to a scintilla of evidence. Accordingly, the district court did not err in [granting summary judgment in spite of the plaintiff's self-serving affidavit]." See id. Rather than excluding an unsupported affidavit, the Fourth Circuit allows the circumstances surrounding the affidavit to go to its weight.

Even though the circuits have taken various approaches to dealing with contradictory evidence offered by one party, the court believes it not prudent to extend the sham affidavit doctrine in the present context. Indications exist that the Affidavit at issue in this case is a sham. It was executed after Defendants moved for summary judgment, and at times, it reads as a concise renunciation of Defendants' statement of uncontested facts. The First Circuit may someday clarify that a party may not submit a self-serving affidavit that directly contradicts the party's own evidence, and the present circumstances would provide such an opportunity. Because Plaintiff was the author

Civil No. 11-1432 (GAG)

of the e-mails cited by Defendants, technically, Plaintiff is creating a material issue of fact between herself. However, the statements contained in the e-mails are not under oath and were not made under the penalty of perjury. While this may seem a diminutive difference, it is an important one. As such, the court will not exclude Plaintiff's Affidavit as a sham. It would be up to the jury to decide how much weight to give Plaintiff's testimony when it hears her testify. Defendants will surely have the opportunity to discredit that testimony with Plaintiff's own contemporaneous e-mails.

### 3. Contradiction Through Deposition Testimony

Defendants object to one assertion contained in the Affidavit, claiming it directly contradicts Plaintiff's deposition testimony. Specifically, whether Plaintiff was hired to cover the Puerto Rico market. (See Docket No. 77 at 4.) Defendants first point to Plaintiff's deposition testimony which states in part:

> Q: Give me an example of a U.S. Supplier that you understood you would be developing that brand.
>
> A [Plaintiff]: Like let's say Pierre Food, "P-I-E-R-R-E", Pierre Foods, developing their Pierre brand. And in that case, the Pierre Brand, he told me to develop Sterling Grillers in Puerto Rico and then Pierre Brand in Panama.
>
> Q: Let's start with the Sterling Grillers. You said that your understanding was that you were to develop Sterling Grillers in Puerto Rico.
> Tell me what you talked about specifically in regards to developing Sterling Grillers in Puerto Rico.
>
> A: We spoke about making presentations, product presentations to different distributors . . . .

(Docket No. 50-2 at 21-22.) This testimony is consistent with other parts of Plaintiff's deposition testimony in which she refers to her duties and work performed within Puerto Rico. (See Docket Nos. 50-3 at 16; 50-4 at 3, 56-57.) However, it contrasts Plaintiff's Affidavit, in which she states, "As part of my duties, I did not cover the Puerto Rico market, since this geographic area was overseen by codefendanat Jose Cusido. As part of her employment, it was understood that Panama was to be the first geographic market to be developed and I was advised time and again by Jose Cusido that 100% of her efforts should be concentrated on developing the Panama Market." (Docket

8

**Civil No. 11-1432 (GAG)**

No. 69-1 ¶¶ 19 & 20[2].)

In order for the court to allow this statement contained in the Affidavit, Plaintiff must explain why her previous testimony is different.  It is clear from the deposition testimony that Plaintiff believed her duties included the Puerto Rico market.  What is not clear is why the testimony changed.  Plaintiff does not attempt to explain the difference in testimony, rather, Plaintiff fails to recognize how these statements are contradictory.  (See Docket No. 81 at 5.)  Due to the lack of a suitable explanation, the court **GRANTS** Defendants' motion to strike the testimony in the Affidavit claiming Puerto Rico was not a market for which Plaintiff was responsible, but **DENIES** Defendants' motion to strike the remainder of the Affidavit.

**B.      Local Rule 56**

Additionally, the local rules of civil procedure govern the parties' submissions of summary judgment materials.  See L.Cv.R. 56 (D.P.R. 2009).  Particularly important to these proceedings is Local Rule 56(c) which states,

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts.  The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

L.Cv.R. 56(c).  A party opposing summary judgment has the obligation to admit, deny or qualify the moving party's statements of uncontested fact.  If the non-moving party wishes, it may include a separate section that includes additional facts, the party may do so.  See L.Cv.R. 56(c).  This separate

---

[2]  The court notes the Affidavit is written in both the first person and the third person, often changing intermittently within the same paragraph as depicted above.  The court understands the use of the third-person pronoun 'her' to describe Plaintiff's employment instead of the first-person 'my' is unintentional.  However, such drafting also makes the court question whether the Affidavit was hastily drafted by Plaintiff's counsel for the purpose of defeating Defendants' summary judgment motion.

**Civil No. 11-1432 (GAG)**

1   section containing additional facts is necessary to allow the moving party to reply to those additional

2   facts and to allow the court to easily determine the disputed facts.  See L.Cv.R. 56(d) (governing

3   reply statements of material facts).  Therefore, a party may not include numerous additional facts

4   within its opposition to the moving party's statements of uncontested facts.  See Acevedo-Parrilla

5   v. Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir. 2012) (citing Carreras v. Sajo, Garcia &

6   Partners, 596 F.3d 25, 32 (1st Cir. 2010) (holding party's argument that Local Rule 56(c) does not

7   require separate section for additional facts unavailing)).  It is within the district court's discretion

8   whether to consider additional facts that are not included in a separate section.  See Acevedo-

9   Parrilla, 696 F.3d at 137.

10         Pursuant to this rule, the court notes Plaintiff attempts to assert various facts within her

11   response to Defendants' statement of uncontested facts.  (See Docket No. 68.)  The court shall not

12   sift through Plaintiff's responses to locate additional facts.  As such, the Relevant Factual

13   Background section of this Opinion and Order shall include only properly submitted uncontested

14   facts.

15   **III.    Relevant Factual Background**

16         Plaintiff has worked in the food distribution industry since 1998.  (See Docket Nos. 50-1 ¶

17   1; 68 ¶ 1.)  Plaintiff previously worked as a Brand Manager for Packers Provision in Puerto Rico.

18   (See Docket Nos. 50-1 ¶ 2; 68 ¶ 2.)  That job required her to develop brands for different buyers,

19   which included sales forecasts, marketing, promotions and product presentations to potential buyers.

20   (See id.)  Plaintiff was hired to develop the Sterling Grillers brand in Puerto Rico and Panama.  (See

21   Docket Nos. 50-1 ¶ 3; 68 ¶ 3.)  During the hiring process, Plaintiff discussed the possibility of using

22   Avipac as a distributor of Defendants' products in Panama.  (See Docket Nos. 50-1 ¶ 4; 68 ¶ 4.)

23   Plaintiff met with David Krantz ("Krantz"), Cusido and others in Miami to discuss her employment

24   terms.  (See Docket Nos. 50-1 ¶ 5; 68 ¶ 5.)  Krantz sent Plaintiff an e-mail confirming her

25   employment terms, which Plaintiff received.  (See Docket Nos. 50-1 ¶ 15; 68 ¶ 15.)  In that e-mail,

26   Krantz listed several suppliers Plaintiff represented she had existing contracts with and could bring

27   them to Sterling.  (See Docket Nos. 50-1 ¶ 16; 68 ¶ 16; 50-4 at 13.)  Plaintiff stated she would bring

28                                                 10

Civil No. 11-1432 (GAG)

her industry contacts, supplier contacts and that everything would be done through Sterling Foods. (See Docket Nos. 50-1 ¶ 6; 68 ¶ 6.)  Defendant was told that Plaintiff represented Pierre Foods Products in Panama through her company, Sun Marketing.  (See Docket Nos. 50-1 ¶ 7; 68 ¶ 7.)  It is undisputed that Plaintiff was doing business for Sun Marketing while she was employed by Defendants; however, it is contested to what degree she was working for both companies.  (See Docket Nos. 50-1 ¶ 8; 68 ¶ 8.)  It is certain that Sun Marketing was a d/b/a for Plaintiff and she told the suppliers of Sun Marketing that everything was going to be done through Sterling.  (See Docket No. 50-3 at 12-13.)  Plaintiff did not make any sales in Panama or Puerto Rico on behalf of Sterling. (See Docket No. 50-3 at 17-18.)

Krantz is the general manger of Sterling Foods and is the supervisor of Cusido.  (See Docket Nos. 50-1 ¶ 20; 68 ¶ 20.)  Cusido is in charge of opening new accounts, including new accounts in Puerto Rico.  (See Docket Nos. 50-1 ¶ 21; 68 ¶ 21.)  Krantz recruited Plaintiff to work at Sterling. (See Docket Nos. 50-1 ¶ 22; 68 ¶ 22.)  While the parties disagree as to whether Plaintiff stated a specific amount of business she could bring to Defendants, Plaintiff stated that based on her experiences, once the Panama market was developed, Defendants could expect roughly $400,000 worth of business each month.  (See Docket Nos. 50-1 ¶¶ 23-24; 68 ¶¶ 23-24.)  Plaintiff met with a representative from Sterling in Miami prior to being hired and discussed her job responsibilities. (See Docket Nos. 50-1 ¶ 27; 68 ¶ 27.)  Sterling representatives informed Plaintiff that they expected her to bring in a couple hundred thousand dollars worth of contracts each month as the Panama market began to develop.  (See Docket Nos. 50-1 ¶ 28; 68 ¶ 28.)  Defendants claim they relied heavily on Plaintiff's assertion she could bring in this type of business when they offered her a job. (See Docket No. 50-6 at 14.)

Plaintiff's employment began on May 14, 2010.  (See Docket Nos. 50-1 ¶ 33; 68 ¶ 33.)  For her work, Plaintiff received a base salary of $80,400, plus other compensation that raised her annual salary to $88,200.  (See Docket Nos. 50-1 ¶ 30; 68 ¶ 30.)  Plaintiff's hiring agreement states that Plaintiff shall bring nine suppliers to Sterling to distribute foods in several countries.  (See Docket Nos. 50-1 ¶ 31; 68 ¶ 31.)  Communications between Plaintiff and Defendants were mostly through

11

Civil No. 11-1432 (GAG)

remote communication, i.e., phone calls and e-mails.  (See Docket Nos. 50-1 ¶ 34; 68 ¶ 34.)

The parties aggressively dispute whether Plaintiff's job performance was up to par.  Plaintiff was provided with food samples and tools for the Panama food show, but no sales were generated from that show.  (See Docket Nos. 50-1 ¶ 35a; 68 ¶ 35a.)  Plaintiff was unable to secure any business in Panama during the four months of her employment.  (See Docket Nos. 50-1 ¶ 35c; 68 ¶ 35c.)  Plaintiff was unable to get a letter approved appointing Sterling as the exclusive distributor from her contacts in Panama.  (See Docket Nos. 50-1 ¶ 35d; 68 ¶ 35d.)  While at the Panama trade show, roughly half of the boxes of food arrived and the parties each point the finger at the other for that mis-communication.  (See Docket Nos. 50-1 ¶ 35g; 68 ¶ 35g.)  Due to what Cusido regarded as failures in planning for the food shipment, Cusido suggested cancelling the show altogether.  (See Docket No. 50-6 at 21-22.)  When they arrived at the hotel, a conference room that was too small to hold the show had been reserved, but that room was later substituted for a larger, more appropriate one.  (See Docket Nos. 50-1 ¶ 35j; 68 ¶ 35j.)  Krantz met with Plaintiff after the Panama show in order to discuss the expenses relating to the show and payment, but the parties dispute the tone the conversation took.  (See Docket Nos. 50-1 ¶ 35l; 68 ¶ 35l.)

On August 6, 2010, Plaintiff produced a proposed purchase form.  Defendants insist Plaintiff used this document as a means to demonstrate a hard sale, while Plaintiff insists this was a *pro forma* document customary in the industry.  (See Docket Nos. 50-1 ¶ 35n; 68 ¶ 35n.)  After the Panama show, Cusido and Krantz kept in close contact with Plaintiff regarding her sales.  (See Docket Nos. 50-1 ¶ 37; 68 ¶ 37.)  On August 16, 2010, Plaintiff sent Cusido a *pro forma* order from Avipac in Panama for roughly $115,000 worth of sales.  (See Docket Nos. 50-1 ¶ 38; 68 ¶ 38.)  In response, Krantz e-mailed Plaintiff stating, "Good job with the first order.  I know you have been working hard to put this together, congratulations."  (See Docket No. 50-9 at 5.)  Plaintiff responded by stating that some changes would be made regarding quantities and products and also noting that she would be traveling to Panama the following week to "finalize the details."  (See id.)  On September 2, 2010, Krantz e-mailed Plaintiff, stating, "It is very important that you call [Avipac] this morning and call me back.  I need answers quickly as to what is going on and I need them this morning.  Please call

**Civil No. 11-1432 (GAG)**

me as soon as you can." (See Docket No. 50-9 at 9.)  In response, Plaintiff e-mailed Avipac and attempted to speed along the process. (See Docket No. 62-1 at 3.)  In response, the representative from Avipac stated there were still several steps to be taken before an order was placed. (See Docket Nos. 50-1 ¶ 43; 68 ¶ 43.)  Plaintiff stated that the process would be fine, but that she needed confirmation of the order and resolution of the details without further delay. (See Docket Nos. 50-1 ¶ 44; 68 ¶ 44.)

Concerned about the lack of an order, Krantz e-mailed Cusido asking him to furnish Plaintiff with the prices of their products because Krantz did not want to give her any excuses when she spoke with Avipac. (See Docket No. 50-9 at 11-13.)  Defendants continued to press Plaintiff to furnish an order from Avipac. (See Docket Nos. 50-1 ¶ 49.)  Concerned with the lack of an order, Krantz asked Cusido to call Avipac to learn of the status of the order. (See Docket Nos. 50-1 ¶ 50; 68 ¶ 50.)[3]  At this point, Plaintiff told Cusido and others that the order was coming. (See Docket Nos. 50-1 ¶ 51.)  Cusido was informed that Avipac had not sent any purchase order to Sterling. (See Docket Nos. 50-1 ¶ 52; 68 ¶ 52.)

On September 6, 2010, Plaintiff informed Cusido that she was pregnant. (See Docket Nos. 50-1 ¶ 54; 68 ¶ 54.)  Defendants never received any medical certificate demonstrating that Plaintiff was pregnant. (See Docket Nos. 50-1 ¶ 55; 68 ¶ 55.)  On September 7, 2010, Cusido called Avipac

---

[3] The response to this statement of fact exemplifies many of Plaintiff's responses.  While the fact is denied, Plaintiff's reason for its denial is non-responsive to Defendants assertion. Plaintiff's response is exactly the same as many of the other responses to different facts.  In this instance, the fact at issue is whether Krantz requested Cusido to call Avipac directly to learn of the status of the order.  In denying the fact, Plaintiff rehashes her argument that the 'order' was actually a *pro forma* order and the amounts were subject to change. (See Docket No. 68 ¶ 50.)  Whether Plaintiff denies that Krantz requested Cusido to call Avipac is never addressed.  Plaintiff's counter statement of facts are replete with such responses, often the response to one fact is simply copied and pasted as a response to others.  The court deems the facts that are denied with non-responsive answers to be improperly denied, and therefore, admitted. See Rodriguez-Diaz v. Cruz-Colon, Case No. 10-1764 (GAG), 2012 WL 2989974, at *1-2 (D.P.R. July 23, 2012); see also Aulisio v. Baystate Health Sys., Inc., Civ. Action No. 11-30027-KPN, 2012 WL 3957985, *3-4 (D. Mass. Sept. 07, 2012).

**Civil No. 11-1432 (GAG)**

1  and confirmed that Avipac had not placed an order and that they did not have warehouse space large

2  enough to hold the amount of food proposed in the *pro forma* order.  (See Docket No. 50-6 at 28.)

3  On September 7, 2010, Plaintiff communicated with Hemisphere Foods that she would have

4  an order no later than that week.  (See Docket Nos. 50-1 ¶ 59; 68 ¶ 59.)  Also on that date, Plaintiff

5  informed Cusido that she cancelled her trip to Panama to meet with Avipac because of her

6  pregnancy, but would still work with Avipac to coordinate the order.  (See Docket Nos. 50-1 ¶ 60;

7  68 ¶ 60.)

8  As of September 8, 2010, no purchase order was made.  (See Docket Nos. 50-1 ¶ 61; 68 ¶

9  61.)  The following day, Plaintiff e-mailed Avipac saying that unless an order was placed, she would

10  be forced to find another distributor in Panama.  (See Docket Nos. 50-1 ¶ 62; 68 ¶ 62.)  On

11  September 13, 2010, Plaintiff sent another e-mail to Avipac seeking a time to discuss the order and

12  figure out how to structure the deal in order to finalize it.  (See Docket Nos. 50-1 ¶ 63; 68 ¶ 63.)  By

13  September 30, Plaintiff knew Avipac had informed Defendants that Avipac had not placed an order

14  and that Avipac was billing Sterling $7,000 for expenses related to the Panama show.  (See Docket

15  No. 50-7 at 36.)  Defendants met with Plaintiff sometime in September and asked Plaintiff to resign.

16  (See Docket Nos. 50-1 ¶ 66; 68 ¶ 66.)  Apparently, while there is no letter of resignation from

17  Plaintiff in evidence, Plaintiff did e-mail her intent to resign to Maritza Arza ("Arza") stating her

18  final day would be September 17, 2010.  (See Docket No. 62-1 at 9.)

19  In late September, a representative from Avipac met with Cusido.  From that meeting,

20  Avipac sent an e-mail to Plaintiff asking her to qualify a few topics of concern.  Those topics

21  included: (1) the splitting of costs between Avipac and Sterling, which Avipac claims to have never

22  agreed; (2) the *pro forma* order from Avipac, to which was never authorized or registered with

23  Avipac; (3) the volume of the *pro forma* order.  (See Docket Nos. 50-1 ¶ 76; 68 ¶ 76.)  Plaintiff

24  never responded to this e-mail.  (See id.)  On October 4, 2010, Plaintiff informed Cusido that she

25  was not resigning and that she never formally resigned in the first place.  (See Docket No. 62-1 at

26  14.)  The following day Plaintiff filed a charge of discrimination with the EEOC, claiming she was

27  asked to resign on September 16, 2010, two days after she notified him of her pregnancy.  (See

28  <center>14</center>

Civil No. 11-1432 (GAG)

Docket Nos. 50-1 ¶ 78; 68 ¶ 78.)  After Plaintiff left, Edgar Vargas Roldan ("Vargas") began

working for Defendants.  (See Docket No. 69-4.)  Defendants claim no one was hired for Plaintiff's

position after she left.  (See Docket No. 50-6 at 44.)  Defendants claim Vargas was hired as an

independent contractor to develop a trading business.  (See Docket No. 50-6 at 43.)

**IV.    Discussion**

   **A.    Plaintiff's Title VII and PDA Claims**

   Plaintiff's claims arise from the protections offered by Title VII and the Pregnancy

Discrimination Act ("PDA").  Title VII makes it unlawful to "discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); see

Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011).  The PDA specifically included

pregnancy within the definition of 'because of sex' so that Title VII clearly extends its protections

to include discrimination due to pregnancy.  See 42 U.S.C. § 2000e(k) (stating, "The terms 'because

of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy

. . .").  While it is clear an employer may not discharge an employee based on the fact she is pregnant,

an employer may discharge a pregnant employee "for legitimate reasons unrelated to her pregnancy."

See Martinez-Burgos, 656 F.3d at 12 (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 424 (1st

Cir. 1996)).  Unless direct evidence of such discrimination exists, the court applies a burden shifting

framework to examine the claims.

   As the parties point out, the first stage of this burden shifting scheme is not onerous.  See

Martinez-Burgos, 656 F.3d at 12; Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).  Once

Plaintiff has made the *prima facie* showing, a rebuttable presumption of discrimination is created.

See Martinez-Burgoz, 656 F.3d at 12.  This presumption is eliminated once Defendants articulate

a non-discriminatory reason for the adverse action.  See id.  The final stage places the burden back

on Plaintiff to demonstrate the adverse action was taken due to discrimination, and the non-

discriminatory reason proffered by Defendants was a mere pretext.  However, the standard for

Plaintiff to rebut Defendants' legitimate reason is more demanding than the rather lax standard

15

applied to Plaintiff's *prima facie* case.  See Martinez-Burgos, 656 F.3d at 12 (citing Kosereis, 331 F.3d at 213).  Plaintiff may demonstrate the pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." Martinez-Burgos, 656 F.3d at 14 (citing Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal quotation marks omitted).

In order for Plaintiff to meet the *prima facie* test, Plaintiff must demonstrate: (1) she was pregnant or intended to become pregnant; (2) Plaintiff was qualified for the position and performed her job satisfactorily; (3) Plaintiff suffered an adverse employment action, and; (4) Defendants sought a replacement or continued to have her duties performed by a person with roughly the same qualifications.  See F.W. Morse & Co., Inc., 76 F.3d at 421; Gervais v. Franklin Pub. Sch., Civ. Action No. 09-10719-DJC, 2012 WL 988026, at *9 (D. Mass. Mar. 23, 2012).  In this case, because the parties dispute whether Plaintiff resigned or was terminated, the parties also dispute whether it was necessary for Plaintiff to produce evidence that she was constructively discharged as a fifth element to her *prima facie* case.  As discussed below, without going into deep analysis, the court assumes Plaintiff has established her *prima facie* case in order to reach the later stages of the burden shifting analysis.  Therefore, the court assumes *arguendo* that Plaintiff has met the *prima facie* case.

Defendants state the reason they terminated Plaintiff was due to her poor job performance.  Plaintiff claims this is a pretext exemplified by inconsistencies in Defendants' testimony as well as by the timing of Plaintiff's termination.  (See Docket No. 67 at 16-19.)  For Plaintiff to sufficiently demonstrate pretext, and therefore defeat Defendant's summary judgment motion, Plaintiff must marshal sufficient evidence to demonstrate both that Defendants' reason for termination was pretextual and the real reason for her termination was because of her pregnancy.  See Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994).  Therefore, Plaintiff must not only demonstrate that Defendants' reason is pretextual, but also that the real reason was impermissible discrimination.  See id.; Ruiz v. Posadas de San Juan Assocs.,

124 F.3d 243, 250 (1st Cir. 1997).  After evaluating the evidence in the light most favorable to

Civil No. 11-1432 (GAG)

Plaintiff, the court finds that no genuine issues of material fact exist as to the issues of pretext and discriminatory animus due to Plaintiff's pregnancy.

Plaintiff relies on Santiago-Ramos v. Centennial P.R. Wireless Corp. to show that pretext may be demonstrated through weaknesses, implausibilities and inconsistencies in Defendants stated legitimate reason. 217 F.3d 46, 56 (1st Cir. 2000) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). In that case, there was inconsistent testimony between the time when the pertinent events occurred and when it came time to terminate the employee. See Santiago-Ramos, 217 F.3d at 56. Matters deemed minor before the plaintiff had been terminated were later characterized as major and important after termination. See id. Evidence of this nature, that changes depending on whether it is given pre-termination or post-termination, would allow a factfinder to determine the defendants were attempting a cover-up for discrimination. The problem for Plaintiff in the instant case is that Defendants' testimony supports their stated legitimate non-discriminatory reason. First, the evidence shows Defendants were eager to begin selling their products in Panama. During her entire tenure with Defendants, Plaintiff was unable to make any sales, either in Panama or in Puerto Rico. Second, while one vendor at the Panama food show may have told Plaintiff that it was a success, it is clear Defendants did not interpret the show as such. There was an issue with the amount of boxes of food that arrived to the show, the reserved room for the show, as well as how the expenses for the show were to be distributed. Due to these issues, Cusido suggested it be cancelled. Plaintiff vehemently denies these shortcomings were her fault, but the reasons set forth by Defendants for terminating Plaintiff now are the same complaints Defendants expressed when the events occurred. Therefore, Plaintiff has failed to demonstrate sufficient weaknesses, implausibilities, and inconsistencies to demonstrate pretext.

Even if Plaintiff was able to demonstrate pretext, Plaintiff fails to create a genuine factual issue as to defendants terminating her due to pregnancy. Only the timing of Plaintiff's termination lends support to her theory that she was terminated due to her pregnancy. Plaintiff informed Cusido she was pregnant on September 6, 2010 and resigned sometime in mid- to late-September. While, on its face, the timing may seem suspicious, after reviewing the evidence, asking Plaintiff to resign

17

Civil No. 11-1432 (GAG)

in mid-September supports Defendants' position.  Defendants' communications with Plaintiff leading up to her resignation can be characterized as demanding.  Defendants were becoming impatient with Plaintiff's lack of sales and the misunderstanding regarding the *pro forma* order did not help to ease relations between the parties.  Most of these issues arose well before Plaintiff announced her pregnancy.  However, what is of ultimate importance at this stage is the complete lack of evidence suggesting that Defendants asked Plaintiff to resign due to her pregnancy.  Neither are there communications demonstrating that any Defendants or their employees began to treat Plaintiff differently after her announcement, nor were there remarks made regarding Plaintiff's condition.  Other than the timing of her resignation, there is a complete lack of evidence to demonstrate Defendants asked Plaintiff to resign due to her pregnancy.  Because Plaintiff has failed to provide evidence that Defendants proffered reason for asking Plaintiff to resign is pretextual, and the pretext was designed to mask Defendants' discriminatory animus against her due to her pregnancy, the court **GRANTS** Defendants' motion for summary judgment at Docket No. 50.

### B.    Plaintiff's Title VII Hostile Work Environment Claim

In the complaint, Plaintiff briefly mentions a claim for hostile work environment; however, throughout Plaintiff's opposition to summary judgment, Plaintiff fails to mention her hostile work environment claim.  Defendants mention this undeveloped argument in their motion for summary judgment and devote roughly four pages to the issue.  (See Docket No. 50 at 16-20.)  The court deems the claim waived by Plaintiff, as she only mentions a hostile work environment twice in the complaint and does not attempt to defend the claim against Defendants' motion for summary judgment.  When an issue is merely mentioned in an undeveloped fashion and in a perfunctory manner, the court may deem the issue waived.  See Latin Am. Music Co. Inc. v. Media Power Group, Inc., No. 11-2108, 2013 WL 150311, at *6 (1st Cir. Jan. 15, 2013); Garcia-Rosado v. Scotiabank, Civ. No. 12-1383 (JAF), 2013 WL 209294, at *4 (D.P.R. Jan. 17, 2013) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  Therefore, the court dismisses Plaintiff's Title VII hostile work environment claim.

### C.    Local Law Claims

18

Civil No. 11-1432 (GAG)

Plaintiff's complaint also alleges claims that arise under the Puerto Rico Constitution, Law 3, Law 69, Law 80, Law 100 and Article 1802. It is within the discretion of the court to exercise supplemental jurisdiction over local law claims once the federal claims have been dismissed. See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) (stating, "To be sure, the exercise of supplemental jurisdiction in such circumstances is wholly discretionary.") In this case, all of Plaintiff's local law claims arise from the same set of alleged discriminatory acts as Plaintiff's federal law claims. The court has analyzed the pertinent facts and found no genuine issues of material fact exist. In order to conserve judicial resources, the court exercises its discretion to rule on Plaintiff's local law claims. These claims fail for the same reasons as Plaintiff's federal law claims fail, that is, she has not created any genuine issue of material fact as to pregnancy discrimination. More so, she is not claiming discrimination for unlawful termination under any other basis. Therefore, the court **DISMISSES** Plaintiff's local law claims.

**V.      Conclusion**

For the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to strike (Docket No. 77) and **GRANTS** Defendants' motion for summary judgment (Docket No. 50).

**SO ORDERED**

In San Juan, Puerto Rico this 28th day of January, 2013.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge

19